Our first case is PGS Geophysical. Are counsel ready to proceed? Yes, Your Honor. You want 10 and 5? Yes, please. Good morning. David Burrell for PGS Geophysical. May it please the court. This case raises the question of whether a claim may be rendered obvious by a proposed combination that the parties and the board agreed confers no benefit whatsoever, and that, in fact, exacerbates the very problem that the lead reference was directed to solve. Can I interrupt and ask you about the SAS issue, which I know you submitted a joint filing on this morning? That, at least, leaves some questions, not about whether you have waived any right you may have, which you say you have, not whether Western GECO has, by its silence and its settlement and what not, waived any rights, but about whether the absence of institution on certain claims, let's say, is, in fact, waivable, or whether it has the character of certain kinds of jurisdictional issues, whether agency jurisdiction, I'm not sure that term matters in the agency context, but ours, it matters. And therefore, whether we have a final written decision in front of us that we can exercise jurisdiction over the analogy, obviously, being if there were unadjudicated claims in a district court, we wouldn't have a final judgment. We may be asking for more briefing on that kind of question, but do you have anything preliminary to say about why this is all waivable and we can stop thinking about it? Sure, a few things I'm happy to submit briefing, if your honors would desire, but we didn't interpret the Supreme Court and SAS to be announcing a jurisdictional rule. There is a final decision in this case, and it is a final decision on all claims that are presently in dispute between the parties. The Supreme Court's decision in SAS recognizes that the final decision could involve a separate set of claims than the initial institution decision. For example, if the patent owner amended claims during the proceeding, and the statute is open to that. Here, we have a final decision on a different set of claims than the petition attacked, in part because of a settlement, but the issue at its core remains the same. All of the claims that are disputed here, and all of the claims that are disputed at the time of the final decision, those are all now before the court for adjudication. We don't want more claims to be adjudicated. The patent office doesn't want more claims to be adjudicated, and Western Geco is not here asking for more claims to be adjudicated, so there's no harm here. All of the claims that are in dispute are before the court, and we see no reason that that's not an appropriate final decision per SAS for this court to take jurisdiction and decide the case. If we did send it back down, who would represent whom with what position? That's a great question. I'm not sure that there are really any answers to that. I suppose the PTO could try to place themselves in the petitioner's shoes. They'd then be judge, jury, and executioner in the same case. They'd make the enemy, and he is us. Indeed, and so it's sort of a kabuki theater that I suppose would happen on remand. I'm not sure exactly what would happen, but again, no one's asking for that. We are only disputing certain claims. The patent office is only trying to defend the board's decision as to certain claims, and those claims are before the court. There's no requirement in SAS that all of the claims in the petition be before this court in order for this court to have jurisdiction over the case. Would you also say that even if those claims should have been included in the proceedings and part of the final decision, the fact that they weren't would be an error that could be waived by you? I think that's certainly right. I think the patent office probably has stronger views on that than we do, but if that's a way that Your Honor and the court wants to arrive at a place where jurisdiction is conferred so that we could have raised this, but we waived it, I'm perfectly willing to stand here and say that we waived any right to have those additional non-instituted claims adjudicated. Those rights are waived. But that's what the petitioner did. Right. The petitioner did, or we did, or anyone did, but the point is no one's asking for any of those claims to be resolved here. They're gone. They're gone. We're just asking for these claims that are the subject of the appeal to be decided, and that's all the patent office wants decided as well. Does that answer Your Honor's question? Do you have any case law or anything that you would cite to support that position at this point? Well, I mean, I think SAS itself, as I said, sort of foresees the possibility of not all claims that were in the petition end up before a court. If we had, for example, dropped some claims or amended near the end of the opinion, the Supreme Court says, well, that can certainly happen, and there can be a delta, therefore, between the petitioner's claims that he included in the petition and the claims that are subject to the final decision and then, of course, the review by this court. And here we have the exact same result for a different reason because of a settlement, but that poses no jurisdictional problem, it seems, per SAS, and I would just say that it can be extended to this situation certainly with the party's permission. With Your Honor's permission, I'd like to return to the dispute that the parties have. I observe the unique nature of this. I'm going to give you an extra five minutes on that. I appreciate that, Your Honor. Most cases of obviousness involve a balancing between the perceived benefits of a combination and its detriments. This case, I would submit, is quite unique. There is no benefit that the petitioner ever identified to combining the two prior art references at issue here. One of the arguments that's made in the petition, or at least maybe it's in the expert evidence provided by the petitioner, is that the primary reference says any encoding technique could be in use, and then the secondary reference teaches an encoding technique that it claims is beneficial. Why wouldn't that be a motivation to combine? That is, the primary reference says you can use any encoding, and the secondary reference says here's one that's particularly good. Why is that not a motivation to combine? If I could answer the question in two ways. First, the primary reference does not say use any kind of coding. It says use any desired type of coding. There was no finding by the board whatsoever that the Eddington time delay embodiment was a desired type of coding. That factual predicate is missing from the board's opinion. In fact, there's good reason for it. They didn't just forget to put that word in. There was no evidence in the record to support that idea. The evidence was, and it was undisputed, that making that combination of Beazley plus Eddington, putting the kind of time delay that Eddington uses in combination with Beazley, would not be desired at all. On the contrary, it would create a smearing problem, a lack of spatial resolution. This is kind of your teaching away argument, right? Yeah, and I know we presented that in a sense as a separate argument, and I think it's a separate reason that the court can reverse, but it's part and parcel of the same issue. I think that teach away is simply the flip side of motivation, and per KSR and this court's case law, they can be put together in an inquiry of, is there motivation? Is there a reason, as the Supreme Court put it, to combine these two things? Do you dispute that a person of skill would have looked to the land seismic techniques of Eddington when designing the marine seismic techniques? It would not have excluded Eddington on the basis that it's a land technique. We certainly agree with that, but then what happens when you combine Beazley and Eddington? I think it's important to tease this out for a moment, if I may, because I think this got lost a little bit in the briefing, and the PTO never responded to this, and I think this is the core issue in the case, and it's as follows. Beazley has two separate embodiments, a so-called sequential firing embodiment, and a simultaneous or near-simultaneous embodiment. In the sequential embodiment, what happens is source one fires, and then after what it calls half an interval, source two fires. So it goes once and waits, and then the second source fires. Dr. Lin explained how long that delay is. At page A884, he says half an interval, that's half of a shot time, and that is five seconds, because there are 10 seconds between shots. There's a further explanation that in those five seconds, a vessel moves about 12.5 meters. So what you have in the sequential embodiment of Beazley is source one fires, 12.5 meters of movement, and then source two fires. And those two sources are treated as having been fired from the same place. And what Beazley says is that creates what he calls in column seven, a lack of commonality due to the time delay. That is 12.5 meters of separation, a lack of commonality, and that's not good. That creates a loss of spatial resolution. Your picture is fuzzy, and of course the whole purpose of this enterprise is to get a good picture of the ocean subsurface, so that oil companies know where to look for gas and oil. Then compare that to Beazley's second simultaneous source embodiment. He says the advantage of my simultaneous source embodiment is it gets rid of this loss of spatial resolution. I've solved it because I've fired both of these sources at the same time. I've used a way to separate them based on what's called dip filtering, based on their location, and I have solved the spatial resolution problem. That's my advantage of my second and preferred embodiment. Now observe what happens when one takes that embodiment of Beazley that solved the smearing problem, that solved the spatial resolution problem, and combine it with Eddington. That's the proposed combination in this case. Eddington, and this is undisputed, Dr. Lin explains it, for example, at A1155 and A1192. Eddington takes eight successive shots, and it sums them as if they were all shot from the same place. But since every shot happens only once every 10 seconds, and the boat is moving in this combination of Beazley plus Eddington, what happens is shots that are fired 100 meters or 200 meters apart are treated as if they were fired from the exact same place. 100 to 200 meters is what Dr. Lin says at A1192, and again, there's no refutation of this. It's all agreed upon and undisputed. So what do we have when we combine Beazley and Eddington? We have Beazley that says, look at my simultaneous source embodiment. I have solved the spatial resolution problem. I've solved the smearing problem. I don't have this lack of commonality of 12.5 meters, half a shot. And what is this argument that is being advanced now by the PTO to combine Beazley with Eddington? What they would have the person of ordinary skill do is say, I'll take Beazley, which says it's advantageous because it solved the smearing problem. I'll get rid of that. I'll no longer stop the smearing problem because I'm now firing at a time delay and stacking or summing sequential shots as if they were from the same place. And rather than solving that problem, I'm going to make it 8 to 16 times worse. Rather than having a lack of commonality of 12.5 meters, like the undesired sequential firing embodiment of Beazley, I'm going to separate them by 100 to 200 meters, 8 to 16 times worse, and treat them as if they were from the same place. That's a disaster. That's not obviousness. That's madness. There is no way on earth that a person of ordinary skill would have done that. And we explain that, and there's no response whatsoever from the PTO. We explain this on page 36 of our brief. And what the PTO does is it touts the benefits of Beazley and says, look at Beazley. Beazley says that it solved the smearing problem. And our response is, that's right. Beazley does solve the smearing problem when Beazley is used in its simultaneous source embodiment, when they're fired at the same time, no time delays. But when you combine Beazley plus Eddington, that solution not only goes away, the problem gets much worse. How do your claims avoid the disaster? We don't sum sequential shots as if they came from the same source. This is shown at page 13 of our brief, where we sort of show all the traces and how they're summed. And it's explained by Dr. Lin at page A133. What happens is that the time delays are chosen so that they are asynchronous when something called CMP gathers are used. And so rather than summing successive shots, the time delays are arranged in a way that different kinds of shots in a different kind of collection can be summed, and you get rid of the smearing problem, and it's much better. Other than lawyer argument, what evidence says that that particular level of smearing from the combination of Beazley and Eddington is unacceptable? So you have Dr. Lin's undisputed testimony. And you can find this at A1192 and 1193, where he says that the combination produces significant smearing. And again... Unacceptable, because you used the word unacceptable. So he says significant at A1193. He says that it will have a deleterious effect on the data at A1125. You're right. The word unacceptable came from our patent owner response at A267. But it is, I submit, impossible to read Dr. Lin's testimony any other way but to say that one wouldn't have done this because the smearing is bad. And he explains what I just explained to the court, that it's treating these shots that are taken 100 or 200 meters apart as if they come from the same place. And you would never do that. That is 8 to 16 times worse than the undesired embodiment of Beazley. So I think the point is... Your red light's on. You've got five minutes. I'll let you eat it now or use it in your reply, but keep in mind that it will come out of your reply. Okay. And I understand that. I'd just, I think, like to make one minor additional point, which is that this combination, which produces 8 to 16 times more smearing and defeats the entire purpose of the enterprise, and that's more evidence, if Your Honor would like it, at A1193, which is paragraph 195 of Dr. Lin's expert declaration. Western Geco could have come back during the proceedings and said, Dr. Lin is wrong. The smearing's not that bad. Would have been easy to correct. It's no big deal. No one cares about smearing. They could have said any of those things. They said nothing. The record in this case stands unrebutted, that there's a significant smearing problem that is occasioned by the combination, and there's no evidence on the other side. Again, this is not a situation where there's a bad result that has to be weighed against a good result, like Winner v. Wang, where this case struggled with how you do that. This is just – Winner is a pre-KSR case, and it may be not good for everything it says. Well, even if that's so, Your Honor, we essentially challenge the Patent Office in our brief to come up with one case, any case that holds a patent claim obvious without any advantage conferred by the combination. Well, if there are a couple or three or four, some very small number of known alternatives, it might well under KSR be obvious, all four of them, even for the three that are less advantageous than the first.  So under that part of KSR's rubric, I think there are two factual predicates that must be demonstrated. Number one, that there are a limited number of options. That's never been observed here at all. That's never been advanced by Western G-Code. We explained at A264 in our patent owner response that there are lots of coding techniques. We provided frequency coding, phase coding, polarity coding as examples, and cited a laundry list of prior art references. So the factual predicate of a limited number of options is missing here, and the Board didn't find otherwise. But more importantly, I think, KSR says where there are a limited number of options, and each of them provides the anticipated success, then all of them can be rendered obvious. But again, the only evidence in this case is that rather than anticipated success, one would have expected Beasley plus Eddington to create a big problem. So it's not as if you have each of the options having predictable success. Here, there's no finding of predictability, and on the contrary, there's a finding that the person of ordinary skill would have expected smearing to result from the combination. That's at page 28 of the Board's opinion. So subject to further questions. I was just going to say, I mean, if we were to affirm on the finding of teaching away, if we were to say, I guess there's substantial evidence there, I might not have decided it myself if I were the fact finder, but there's substantial evidence, how does your motivation argument work? You still have a motivation argument? Absolutely. Based on the lack of explanation of why it would be desirable and what you are saying there's a lack of evidence, that there's a limited universe of possibilities. Absolutely. And even if the evidence about smearing were somehow insufficient to meet the level of a teach away, it still must be considered in the context of motivation. Because one has to consider all of the expected effects of combining Beasley plus Eddington, including the smearing effects. So whether you call it a teach away or a reason not to do it or evidence on our side, again, this case is not about taking the bitter with the sweet like most obviousness cases. This is about taking the bitter with the bitter for no reason at all. So at the end of the day they have no evidence about any advantage and there's evidence whether you call it a teach away or not that this is bad. And the Board even accepted as a factual finding that this is going to create smearing and there's nothing sweet on the other side. There's just no reason to do it. So teach away or none, I think that reversal is mandated here. With the Court's permission, I'll reserve the rest of my time. Thank you. Good morning. May it please the Court. To address counsel's arguments about whether or not there is a motivation here, the Board found that the motivation is within the references themselves. You have Beasley, which talks about you can have any desired type of encoding. Where is that in the Board's decision that you think that they actually said that it's based on the references themselves? Well, the Board didn't make that quote. This is based on the references themselves. The Board basically said the petitioner was arguing that you could take the encoding of Eddington, put it into Beasley's system, and that there would be a predictable result. That was the petitioner's argument. And then the Board went through and assessed the combination of Beasley and Eddington, and then in the end said they were persuaded by petitioners' arguments and evidence that the claims were obvious based on this two combinations. There is not a place, Judge Stoll, that I can point to you in the record that says, we are making this finding for this reason. But if you look at the references, Beasley basically encapsulates what – or I'm sorry, I don't want to use the word anticipate. Beasley basically assumes Eddington when it says any type of desired coding. Eddington is solving the problem of trying to find a way to isolate these sources, just like Beasley is, and it is a type of desired coding. What about the argument that I heard counsel make about desired and emphasizing desired, and that there's no finding at all of why Eddington's technique would be desired in Beasley? So I think the way that counsel is looking at desired is like desirable, and I think it could be read as any type of desired coding, as in any type of coding that you would like to use, desired as in a want. And it doesn't have to be better. It just has to be obvious. You don't have to find a reason as to why you would use one thing over another. When you have a reference saying you can use something else here, you just have to show that it is obvious. In Gurley and in In Re Mutet, this court said that just because there are better alternatives that exist in the prior art, it doesn't mean that an inferior combination is inept for obviousness purposes. So I just think of an example, if you'll indulge me for a second. If you had, let's say, a patent for a way to put sneakers on your feet, and someone is using laces for that purpose. I'm sorry, if you had a piece of prior art that had, you can use laces to put sneakers on your feet. And you had another piece of prior art that said, in order to put sandals on, you can use Velcro. Someone could combine those references to put Velcro on sneakers, and they wouldn't have to show that Velcro is somehow better than laces or that there is something inferior about laces. It's obvious, and I know that's a very simple hypothetical, and I just wanted to sort of use it as an example to say, if it's obvious, that is enough. That is the standard. And as for this notion about smearing and whether or not this is somehow teaching away, everyone acknowledges, the board acknowledges, the petitioner acknowledges, and obviously the patent owner acknowledges that smearing is an issue. That is not in dispute here. What comes up, though, is what is the level of smearing? And when the patent owner expert had the burden of production to show evidence that there was a problem with smearing, so basically the petitioner, I see your face, the petitioner has the burden of proof as to obviousness, absolutely. But then when there's an argument for teaching away, you have PGS having to show, well, how does it teach away? You're saying this is an issue. And you had expert Lynn, Dr. Lynn, excuse me, saying, well, there's significant smearing here. But it's a conclusory statement. There was no evidence. There was no facts. They didn't produce anything to show, well, what is significant? What does that mean? Or what's unacceptable. Or what's unacceptable. And the patent owner themselves during oral argument to the board admitted that their own patent has smearing. So it can't be that smearing is somehow adverse to combining these references when the patent itself has smearing. It might be a little bit of smearing. It might be a lot of smearing. We don't know. And that is what the board found. They just weren't persuaded by Dr. Lynn's testimony. It's almost an economic argument, really, unarticulated, which is what lets you find the oil. I agree, Your Honor. And so that is why the board said, okay, we're not persuaded by this argument. And in addition, the claims are broad enough that they don't exclude smearing. So there's nothing in the claim that says there's a problem with smearing. And if you read the patent itself, the patent and the specification doesn't have any discussion about smearing or avoiding smearing being considered a benefit. I understand what you're saying, but I think the argument doesn't necessarily require consideration of whether the claims require smearing or not. Because the argument isn't, do the claims require smearing, and is that taught by the reference? Instead, the argument is, would one of Ordinary Scale New Art not be motivated to make this combination because it would actually increase smearing? I understand, Your Honor. And I just go back to my first point about this smearing is something that is known. A person in Ordinary Scale New Art understands that some smearing would be involved, but we don't know the level of which it would deter a person from combining the references. Because having an expert say there is significant smearing isn't facts and it isn't evidence to convince, it wasn't facts and evidence to convince the board, that that would be some reason to teach away from the combination. What about PGS's counsel referred to language about a deleterious effect? It's on page A1125. Do you have a response to that? And I'm not sure from this part of the expert's declaration if they're talking about the combination or they're talking about something called vertical stacking. But do you have a view on this? Because this was one of the sites that was provided. And it's not just that it's significant. It's talking about a deleterious effect. Yeah, I would say the same thing. I mean, the board read Dr. Lin's expert report and said that it wasn't persuaded by the arguments. I mean, they weren't just pointing to the part that I mentioned about the significant, but they weren't persuaded that there was... What is your take? Do you have a particular technological view on this language that was pointed to us? I mean, setting aside the board has certain deference and they weren't convinced, do you know what this means and what they're saying here? I'd have to look at it more closely, Your Honor. As I stand here, I can look at it really quickly and try to figure out, but I don't. I apologize. At this moment, I just need to sort of read it and figure out what it's saying. But again, I would just say that regardless of my views on it, the board wasn't persuaded by this report. And so just to be clear, there is a motivation. It's within the references themselves. Beasley said any desired type of encoding. Eddington offers that. As far as teaching way, the board was not persuaded that there was a reason not to combine these references. And I'd also add that in terms of the argument that there was burden shifting, that did not occur here. The board looked to Western Geco to satisfy its burden. And if there are no further questions, I yield my time. Thank you. Thank you, counsel. You've got a minute, counsel. If I could make three quick points. First, look at page 26 of the PTO's brief. I submit that gives the game away. That's the only page in their brief where they address the question of whether smearing, and they say it's no big deal. You can read those two pages in vain for any discussion, citation, or reference to Eddington at all. Because they have nothing to say about Beasley plus Eddington. It clearly produces smearing. What they're saying in that section is Beasley alone has not much smearing. Well, when you add it to Eddington, it has a lot of smearing. How much, your honor, wanted to know? Is it a big deal? Is it unacceptable? I submit Beasley answers that question. Beasley says, the advantage of my simultaneous embodiment is that it gets rid of smearing when they're 12 1⁄2 meters apart. That's a big deal for Beasley. So a fortiori, 8 to 16 times as much smearing necessarily is a big deal. If they want to focus on the references themselves, the references themselves answer the question that 8 to 16 times more than Beasley is avoiding is unacceptable. And my last sentence is to deal with their Velcro example. This case is like their Velcro example. If, in addition to the prior art teaching that Velcro was a possibility to fasten shoes, it also taught that Velcro would undermine the entire purpose of the shoes by shredding them. That's exactly what Beasley plus Eddington does. Wait, that's one sentence. It was a run-on, and I apologize, your honor. It makes everything worse. Thank you.